Wilfred CLOUTIER, Mary Cloutier and Pine and Pond, Inc.

v.

TOWN OF EPPING, Roger Gauthier, Warren Celli, Brendan Splaine, Robert J. Chamberlain, Robert Dodge, Richard Sanborn, Earl Arquette, Patrick Jackson, Harold LaPierre, Roger Vogler, William Callaway and Dorothy Hall.

Civ. A. No. 76–311–L.

United States District Court, D. New Hampshire.

Sept. 16, 1982.

**1234**

Wilfred L. Sanders, Sanders & McDermott, P.A., Hampton, N. H., Robert F. Sylvia, Fine & Ambrogne, Christopher P. Sullivan, Carolan & Sullivan, Boston, Mass., for plaintiffs.

Thomas H. Richards, Sheehan, Phinney, Bass & Green, Manchester, N. H. and Michael J. Donahue, Kearns, Colliander, Donahue & Tucker, Exeter, N. H., for defendant Town of Epping.

G. Wells Anderson, Hall, Morse, Gallagher & Anderson, Concord, N. H., for defendants Dodge, Chamberlain, Gauthier and Splaine.

Ronald L. Snow, Orr & Reno, P. A., Concord, N. H., for defendants LaPierre, Vogler, Sanborn, Callaway & Hall.

John W. Barto, Barto & Gfroerer, Concord, N. H., for defendant Patrick Jackson.

Warren Celli, pro se.

## MEMORANDUM

NORTHROP, Senior District Judge, Sitting by Designation.

### *Prologue*

Some general observations on the state of the law in reference to municipalities and their officers is appropriate before applying the law to the operative facts of this case.

There is no question that the decisions of *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) have opened wide the gates of Section 1983 liability of municipalities based on an "enterprise" theory, whatever that means. Notably, the United States Supreme Court has not digressed from its position that *respondeat superior* does not apply in Section 1983 suits as the basis for finding liability of municipalities.[1] However, the impact of *Monell,* in spite of its rejection of *respondeat superior* as the basis of liability, will increase the number of cases that will be brought under Section 1983.

At the same time, limited defenses, such as qualified immunity, are not available to the cities. *Monell* does declare, for whatever it is worth, that cities will not be "vicariously" liable for official misconduct which is not sanctioned by "official policy."

It can be said, with some degree of emphasis, that it is not at all clear what the scope of municipal liability will be under Section 1983. However, as Justice Powell stated in his dissent in *Owen v. City of Independence,* municipalities, in two short years, have gone from absolute immunity

---

1. For a detailed discussion of *Monell* and its rejection of the doctrine of *respondeat superior* see Rothfeld, *Section 1983 Municipal Liability* and the Doctrine of Respondeat Superior, 46 U.Chi.L.Rev. 935 (1979).

under Section 1983 to strict liability. 445 U.S. at 665, 100 S.Ct. at 1422.

These suits against a municipality, as such, are said by some academicians to be, in truth, suits against high-level "policy-making" executive officials who used to enjoy absolute immunity as the municipal enterprise. These officials still have, in their individual capacity, the good faith immunity defense, at least.

It would only confuse the point of this prologue were I to discuss, at great length, the progeny of *Monell* and *Owen.* For my purpose here, it is sufficient to point out that this state of affairs has resulted all in the name of deterring, for the most part, non-existent, errant officials. The travesty is compounded by the fact that these municipalities, who could be faced with such broad liability, are, at the same time, being asked to take up the slack in assuming government functions being relinquished by the federal government.

Although it is not expected that the growth of litigation against municipalities will increase in number as dramatically as the Section 1983 prisoner suits have, it will, nevertheless, require a substantial outlay in insurance payments or in direct legal costs and judgments, which, in the end, will be paid by the municipal taxpayer.[2] Justice Douglas' observation in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) still is correct that manifestly it is the taxpayer who ultimately pays if the "municipal enterprise" is found to be liable.

The concern of the United States Supreme Court appears to be that municipal government officials should be constrained from inflicting harm on others and, at the same time, these constraints must not interfere with the proper performance of their official duties. The cases growing out of the *Monell* doctrine are directed at deterrence of municipal officials but, regrettably, have overlooked the drastic burdens placed upon proper performance of official duties. Nor has any account been taken of the chilling effect these decisions may have on recruiting capable citizens to undertake the chores of government, usually for no remuneration, and on inducing capable citizens to run for elected office.[3]

The municipality is entirely a creation of the state legislature. In due deference to proper federalism, the state laws, and even application of the federal constitution to the actions of the state, should be determined by the state courts. This, of course, had been the prevailing position of the law for a considerable period of time. Even with the advent of federal court intrusion into state affairs by reason of federal constitutional application and post-Civil War acts, abstention was more often than not practiced. Under Section 1983, the state courts, no less than the federal courts, have the obligation to observe the precepts of the federal constitution.

I think it appropriate to say that the decisions do lead putative plaintiffs to believe that there are now two pockets open that of the individual town official and that of the municipality.

---

**2.** Section 1983 prisoner petitions have had a dramatic increase, as shown by the Annual Reports of the Director of the Administrative Office of the United States Courts, 1979—1981. In 1970, there were 2,030 Section 1983 filings by prisoners. By 1981, such filings had increased to 15,639, or over a 500 percent increase in eleven years. Prisoner petitions constitute over 35 percent of the caseload of the Fourth Circuit. While 90 percent of these petitions are dismissed on the pleadings, an inordinate amount of expenses are incurred, both by the federal and state governments in processing these petitions, as well as conducting the trials that result. Worst of all, the deterring effect such filings might be said to have on guards and prison officials is completely overshadowed by the destructive effect on the ef-

forts toward rehabilitation of inmates. For it is said, as long as the criminal mind is preoccupied with blaming society in the form of prison guards and officials, it will not turn its focus on reconstructing its lifestyle to conform to that of society's. So, in a large measure, the Section 1983 prison petitions have frustrated institutional rehabilitation. Increase of suits against municipalities and municipal officials could have an equal countervailing effect and could conceivably destroy this most democratic unit of government, which would be a catastrophe.

**3.** For a detailed discussion of the above, see Case, *Damage Suits Against Public Officers,* 129 U.Pa.L.Rev. 1110 (1981).

The language in several of the leading cases in the area of municipal and city official liability is so convoluted as to cause the reader to overlook threshold elements of federal jurisdiction. If jurisdiction is not present, there simply is no federal forum. The major responsibility of a federal court, it seems to me, where the defendant is an entity of the state, such as a municipality, is to determine whether a substantial federal question is presented and, second, to determine whether the mandates of due process have been satisfied by the defendant. This is particularly so where the fundamental controversy is over land use, a distinctly local matter. To engraft a constitutional dimension on such an acrimonious dispute is an abuse of federal jurisdiction. Yet, such an extension of Section 1983 has been indulged in and urged by federal jurisdiction expansionists.[4]

Therefore, in the "Epic of Epping," the principal issue before this Court is whether federal jurisdiction has been properly invoked.

### Background

The history of this controversy is a lengthy one, the complaint having been filed on October 14, 1976, and having been twice amended. The allegations are broad-based and span a period of nearly a decade. As a consequence, the gist of the present action can best be understood by outlining those allegations.

The action was instituted by Wilfred Cloutier, a resident of the Town of Epping, and a developer and owner of a mobile home park and an apartment building complex, asserting causes of action pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983. The original defendants were the Town of Epping, the Epping Board of Selectmen and the Epping Water and Sewer Commission. The complaint sought the issuance of an injunction to stay the proceedings in the Superior Court of Rockingham County, New Hampshire, which had been instituted by the defendants to restrain plaintiff from developing his lot in West Epping. Plaintiff also challenged the Sewer and Water Commission's denial, on September 1, 1976, of a permit to connect his apartment complex to the municipal sewer system.

This controversy involves claims of a much broader scope than those recited above, as hereinafter noted.

Plaintiff ... alleges that since on or before May 4, 1972, the Town of Epping, its Board of Selectmen, its Planning Board, its Water and Sewer Commission and its Building Inspector have repeatedly denied Plaintiff various permits to develop his real property in Epping, New Hampshire, on the basis of personal bias and malice against the Plaintiff and not upon the basis of a legitimate exercise of lawful authority. *The personal bias and malice entertained by said officials is rooted in the Defendants' disapproval of Plaintiff's political efforts and Plaintiff's exercise of his rights protected by the First Amendment to the United States Constitution to accomplish the abolishment of various land use regulations and regulatory boards. The personal bias and malice entertained by said officials against the Plaintiff is also founded upon the Defendants' personal opposition to Plaintiff's efforts to construct multi-family dwelling units and to develop a mobile home park in the Town of Epping.* (emphasis supplied)

*See* Complaint, paragraph 24 (Docket No. 1).[5]

The complaint was amended on April 20, 1977, to join the individual defendants, Paul Langdon, Robert Dodge and Edward Castle, members of the Board of Selectmen, and Roger Gauthier, Warren Celli, Brendan Splaine and Robert J. Chamberlain, members of the Epping Sewer and Water Com-

---

4. *See* Schnapper, *Civil Rights Litigation After Monell,* 79 Colum.L.Rev. 212 (1979).

5. In 1971, Wilfred Cloutier became Chairman of the Epping Betterment Committee, a pro-growth group, which favored mobile home parks and opposed zoning. *See* Plaintiff's More Definite Statement (Docket No. 172).

mission. Newly-alleged acts included the following:

(1) The May 4, 1972 revocation by the Sewer and Water Commission of a sewer connection permit granted to plaintiff on April 27, 1972, for the reason that the site of the proposed hook-up was outside of the sewer district, as defined by the October 12, 1968 zoning ordinance.

(2) The taking of plaintiff's property by the Town without obtaining a prior grant of easement or initiating condemnation proceedings, and without paying just compensation (occurred in 1970 but alleged to have been discovered by plaintiff in June, 1976).

Central to the majority of the charges plaintiffs level against the defendants is the October 12, 1968 zoning ordinance of the Town of Epping, which will be addressed in detail hereinafter. Essentially, plaintiffs assert that the zoning ordinance is a nullity because the Planning Board, the body whose delegated task is to pass on proposed zoning ordinances, had, in fact, been defunct at the time the subject ordinance had been proposed and adopted. Plaintiffs contend that the Planning Board Study Committee proclaimed itself to be the Planning Board, usurped the powers of the Board, and without any right or authority, proposed the subject zoning ordinance.

An important event occurred during the period between the filing of the original complaint and the amended complaint. The New Hampshire Supreme Court rendered a decision on May 29, 1976, in *Cloutier v. Epping Water and Sewer Commission,* 116 N.H. 276, 360 A.2d 892. That decision will be addressed in connection with the discussion of the zoning ordinance; however, at the time of filing the amended complaint, plaintiff construed the holding therein as declaring invalid and unenforceable the prohibition contained in the October 12, 1968 zoning ordinance against locating mobile homes in the sewer district of the Town.

Again, on December 31, 1980, the complaint was amended to add Mary Cloutier and Pine and Pond, Inc., as plaintiffs and to add causes of action pursuant to 42 U.S.C.

§ 1985(3) and 42 U.S.C. § 1981, alleging a civil rights conspiracy and race discrimination. The jurisdictional basis was supplemented to include 28 U.S.C. § 2201 and § 2202. Defendants Richard Sanborn, Earl Arquette, Patrick Jackson, Harold LaPierre, Roger Vogler, William Callaway and Dorothy Hall were joined. The following conduct is alleged to have been taken in pursuance of the civil rights conspiracy:

(1) Defendants assumed positions of influence and authority on the Board of Selectmen, the Planning Board, and the Sewer and Water Commission for the purpose of utilizing the power and authority of such bodies to deny to plaintiffs their constitutional and statutory rights and to prevent plaintiffs from using their real property for the purpose of apartment and mobile housing development.

(2) Defendants adopted votes for the purpose of hindering and delaying plaintiffs in the development and construction of the mobile home park and apartment housing units within the Town of Epping.

(3) Defendants adopted a policy of discriminatory treatment of mobile home parks and apartment housing developers and development in the granting of permits and licenses for the sole purpose of hindering and delaying such development.

(4) Defendants utilized their positions in order to prevent persons residing in other areas from travelling to and establishing residences in Epping.

The allegations of the complaint were expanded to include the following:

(1) The giving of perjured testimony in relation to the capacity of the newly-constructed Epping sewer system during the trial of the 1972 mandamus action commenced by plaintiff in the Rockingham County Superior Court;

(2) The failure to come forward and correct the record as to these material misrepresentations;

(3) The computation and assessment of excessive real estate taxes on plaintiffs' mobile home park;

(4) The denial of a sewer connection permit for plaintiffs' mobile home park in spite of a town vote, in 1975 and 1977, approving such connection.

(5) The making of false representations at the hearing before the New Hampshire Water Supply and Pollution Control Commission in relation to plaintiffs' application for a discharge permit, to the effect that plaintiffs had failed to obtain Planning Board approval of their mobile home park site;

(6) The failure to connect plaintiffs' mobile home park to the municipal water system in spite of the fact that plaintiffs had obtained a water connection permit in 1978 under the ploy of imposing a moratorium on new connections to the sewer and water systems;

(7) The 1979 proposal of zoning amendments which would have changed the zoning of the area where plaintiffs established their mobile home park to agricultural use;

(8) The 1977 proposal to change the boundaries of the commercial zone, arbitrarily fixing the boundaries so as to exclude plaintiffs' property from the benefits of such prime commercial zoning.

The amended complaint also asserts various pendent claims for intentional and negligent infliction of emotional distress, interference with advantageous business relationships, fraud and injury to business reputation. Plaintiffs seek punitive damages and a judicial declaration that the Epping zoning ordinance of October 12, 1968 is null and void because of defects in its enactment and that the official actions taken by these defendants pursuant to the zoning ordinance are null and void.[6]

*The October 12, 1968 Zoning Ordinance*

Inasmuch as the October 12, 1968 zoning ordinance is pivotal to the claims plaintiffs raise in this civil rights action, the Court must first direct its attention to that ordinance and to the holding of the New Hamp-

shire Supreme Court in *Cloutier v. Epping Water & Sewer Commission,* 116 N.H. 276, 360 A.2d 892 (1976).

Plaintiffs have, throughout the course of this litigation, predicated their charges of unlawful, arbitrary and conspiratorial conduct on the part of the Town of Epping and the individual defendants on the alleged invalidity of the October 12, 1968 zoning ordinance. According to plaintiffs, the New Hampshire Supreme Court decision had declared unlawful and unenforceable the zoning ordinance in its entirety. That decision arose from a petition for writ of mandamus filed in 1972 by Wilfred Cloutier in the Rockingham County Superior Court, following the May 4, 1972 revocation of the sewer connection permit for the mobile home park. The New Hampshire Supreme Court declared unenforceable only that portion of the ordinance which read "[t]he use, rental or maintenance of mobile homes . . . shall be prohibited within the boundary of the sewered area of the Town of Epping," for the sole reason that the provision did not describe the zoned area with sufficient particularity, and the subsequent adoption in 1970 of an official map did not cure the technical defect. In no event did the Supreme Court declare the October 12, 1968 zoning ordinance to be unlawful, *per se,* or as applied because it established impermissible classifications, although plaintiff Wilfred Cloutier challenged the statute on constitutional grounds.

Also before the Supreme Court was the regulation adopted by the Board of Sewer Commissioners, which provided that habitable dwellings located within 200 feet of a street or roadway could be connected to the sewer system. Mr. Cloutier pressed the claim that mobile homes outside of the 200-feet access area should be allowed to connect to the system, inasmuch as the town vote at the March, 1975 town meeting approved such access. The Court rejected the argument, holding that the Town could not circumvent the legal authority of the Sewer

---

**6.** Although plaintiffs have been granted permits to connect their mobile home park to the Town's sewer system, the matter is still alive by reason of plaintiffs' request for compensatory and punitive damages.

and Water Commission to pass regulations necessary to the functioning of the municipal sewer system. Significantly, the Court held that the May 4, 1972 decision by the Commission to restrict plaintiff's mobile homes which were outside of the access area was within the power of the Commission. As a consequence of invalidating Article II(A) of the zoning ordinance because of the technical defect, the New Hampshire Supreme Court held that plaintiff could legally place his mobile home on a portion of his lot within the access area, and then connect the home to the municipal sewer system.

### The Pending Motions for Summary Judgment and/or Motions to Dismiss

Trial of this case was to commence on August 2, 1982, and was estimated to be eight weeks in duration. Approximately one week before that date, various of the defendants filed motions to dismiss and/or motions for summary judgment. The matter came on for hearing on August 25, 1982, following extensive briefing by plaintiffs and defendants.

The motions raise the following reasons why judgment should be entered in favor of these defendants. First, defendants argue that the gravamen of the amended complaint is a local zoning dispute and, therefore, not cognizable under 42 U.S.C. § 1983. Alternatively, defendants urge that the federal courts should abstain from exercising jurisdiction over matters of purely local concern, such as the instant case. Second, assuming that the instant action is cognizable under Section 1983, defendants argue that the claims nonetheless are barred by the defenses of absolute legislative immunity or qualified immunity. Third, in relation to plaintiffs allegations of race discrimination, civil rights conspiracy, and denial of equal protection, defendants move to dismiss for the reason that the necessary elements of a "class" and racial animus are absent and, in any event, these plaintiffs lack standing to assert the rights of nonparty/third persons. Additional grounds for granting judgment in favor of defend-

ants include the statute of limitations, collateral estoppel and res judicata. The Town of Epping additionally moves for dismissal of the "taking" claim for the reason that it has commenced condemnation proceedings in the state court.

The Court shall treat the instant motions as motions to dismiss for lack of subject matter jurisdiction. "On motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter, or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). *See also McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980).

In determining whether plaintiffs have carried their burden in proving that jurisdiction does, in fact, exist, the Court will consider matters outside of the pleadings. *Menchaca v. Chrysler-Credit Corporation,* 613 F.2d 507, 511 (5th Cir.), *cert. denied,* 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980); *Mortenson v. First Federal Savings and Loan Association,* 549 F.2d 884, 891 (3d Cir. 1977).

### The Existence of Federal Subject Matter Jurisdiction

The question of moment, as stated hereinabove, is whether these plaintiffs have established their right to present their claims to this federal forum.

Title 42, Section 1983 reads as follows: Every person who under the color of any statute, ordinance, regulation . . . of any State ∴ . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . .

The jurisdiction of the federal courts to entertain Section 1983 actions is founded in 28 U.S.C. § 1343(3), which reads:

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person.

\* \* \* \* \* \*

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

Plaintiffs contend that their Fourteenth Amendment rights have been violated by reason of the actions taken by the Town and the individual defendants in relation to the implementation and enforcement of the October 12, 1968 zoning ordinance of the Town of Epping, discussed hereinabove. The Fourteenth Amendment proscribes state action of three sorts:

(1) The making and enforcing of any law which abridges the privileges or immunities of citizens of the United States;

(2) The deprivation of life, liberty or property without due process of law;

(3) The denying to any person the equal protection of the law.

*Snowden v. Hughes,* 321 U.S. 1, 6, 64 S.Ct. 397, 400, 88 L.Ed. 497 (1944).

Whether this Court is vested with jurisdiction to entertain the instant action is a question of law. It is essential to jurisdiction that a "substantial federal question ... be presented," and the existence of such substantial federal question "must be determined by the allegations of the bill or complaint." *Ex Parte Poresky,* 290 U.S. 30, 31–32, 54 S.Ct. 3, 4, 78 L.Ed. 152 (1933).

The question may be plainly unsubstantial either because it is "obviously without merit" or because "its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy. *Levering & Garrigues Co. v. Morrin,* [289 U.S. 103, 105, 53 S.Ct. 549, 550, 77 L.Ed. 1062]; *Hannis Distilling Co. v. Baltimore,* 216

U.S. 285, 288 [30 S.Ct. 326, 327, 54 L.Ed. 482]; *McGilvra v. Ross,* 215 U.S. 70, 80 [30 S.Ct. 27, 31, 54 L.Ed. 95].

*Id.* at 32, 54 S.Ct. at 4. *See Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Wiley v. National Collegiate Athletic Ass'n,* 612 F.2d 473 (10th Cir. 1979); *Wright v. Mahan,* 478 F.Supp. 468 (E.D.Va.1979), *aff'd,* 620 F.2d 296 (4th Cir. 1980).

After careful scrutiny of the allegations of the amended complaint and plaintiffs' averments in their memoranda, the Court has determined that plaintiffs assert no rights incident to citizenship of the United States, but, rather, assert rights "derived solely from their state citizenship." *See Slaughter-House Cases,* 77 U.S. (16 Wall.) 273, 19 L.Ed. 915 (1869); *Maxwell v. Bugbee,* 250 U.S. 525, 40 S.Ct. 2, 63 L.Ed. 1124 (1919); *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944). As a consequence, the Court is without subject matter jurisdiction to entertain this action.

**A.** *Privileges and Immunities of Citizens of the United States*

■ Plaintiffs bottom their claims against the Town of Epping and the individual defendants on the Constitution of the State of New Hampshire, Part First, Article 1st, which purportedly imposes on the towns and municipalities of the State the obligation to provide assistance to all citizens.[7] In particular, plaintiffs contend that the Town of Epping and its officials breached their constitutionally-mandated duty to negotiate a workable plan of land-use development with these plaintiffs, a plan that would be acceptable to both the developers and to the Town.[8] *See Carbonneau v. Town of Rye,* 120 N.H. 96, 411 A.2d 1110 (1980).

In spite of all of the artifices adopted by these plaintiffs to exalt the instant controversy to one of constitutional dimension, the nub of plaintiffs' allegations is the al-

---

**7.** Part First, Article 1st of the New Hampshire Constitution reads: "All men are born equally free and independent: Therefore, all government of right originates from the people, is

founded in consent and instituted for the general good." N.H.Rev.Stat.Ann., Vol. 1 (1970 ed.).

**8.** Affidavit of Mary S. Cloutier (Docket No. 315).

leged failure of the Town and its officials to accommodate plaintiffs' proposed plan of development vis-a-vis the Town's land use policy which regulates the location of mobile homes within the Town—a policy which the New Hampshire Supreme Court, when faced with the challenges plaintiffs raise here, did not declare to be unconstitutional on equal protection or due process grounds.

### B. Deprivation of Property Without Due Process of Law

The examination of whether federal jurisdiction has properly been invoked here is not yet complete, inasmuch as the Court must determine whether plaintiffs have sustained injury under the Fourteenth Amendment on account of state action amounting to a deprivation of their property without due process of law. *Snowden v. Hughes,* 321 U.S. at 6, 64 S.Ct. at 400.

■ The Fourteenth Amendment assures procedural protection of property by safeguarding the security of interests a person has already acquired in specific benefits. *Board of Regents v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972). The initial inquiry is whether a property interest in a benefit is at stake as compared to an abstract need or desire.

> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Board of Regents,* 408 U.S. at 577, 92 S.Ct. at 2709.

■ The State of New Hampshire follows the common law rule that a property owner has no vested right to complete his project unless he has engaged in substantive construction, or has incurred substantial liability relating thereto, in good faith reliance on then-existing ordinances. *Henry and Murphy, Inc. v. Town of Allentown,* 120 N.H. 910, 912–13, 424 A.2d 1132 (1980). *See also Wincamp Partnership v. Anne Arundel County, Md.,* 458 F.Supp. 1009, 1027 (D.Md.1978) (applying common law rule).

■ These plaintiffs were placed on clear notice by the October 12, 1968 zoning ordinance and the rules and regulations promulgated by the Sewer and Water Commission that the body politic of the Town of Epping had adopted a land-use policy which restricted the location of mobile homes and mobile home parks to areas of the Town which were not served by the municipal sewer system. Indeed, plaintiff Wilfred Cloutier admits to having been, and continuing to be, a vocal opponent of this plan of zoning, who strongly spoke out against such a policy of land use at the Epping town meetings over the course of the years.[9]

To iterate, although the 1976 decision of the New Hampshire Supreme Court struck down one of the provisions of the zoning ordinance, that decision implicitly affirmed the validity of the Sewer and Water Commission and its regulations and rules, specifically the 200-feet access rule.[10] Plaintiffs had challenged the zoning ordinance, in the state court action on federal constitutional grounds, as well as state law grounds, asserting that the controlling state statute

---

**9.** Nor is there any contention here, nor was any raised in the state court action brought by Wilfred Cloutier, that at the time plaintiff received Planning Board approval of the site plan of the proposed mobile home park, in June, 1968, any representations had been made by these defendants regarding the connection of the mobile home park to the municipal sewer system.

**10.** Plaintiffs allege that the 200-feet access rule had not been promulgated by the Sewer and Water Commission at the time plaintiffs had

been issued their permit in 1972, but rather that the rule had been adopted shortly after the permit had been revoked on May 4, 1972. However, the official rules and regulations of the Sewer and Water Commission, as promulgated and made effective July 1, 1971, provide that premises contiguous to a way and having a habitable dwelling thereon within 200 feet thereof may apply for entrance to the Town's sewer system. *See* Reply Memorandum of Defendants Sanborn, et al., Exhibit A (Docket No. 335).

"[did] not permit a town to prohibit the location of mobile homes within its boundaries but rather allow[ed] a town to adopt minimum construction standards."[11] Nevertheless, the State Supreme Court did not declare the 1968 zoning ordinance invalid on the ground that the classifications made therein between sewered and non-sewered districts and permitted uses within these respective districts was a violation of the Fourteenth Amendment.[12]

As a consequence, regardless of plaintiffs' *post-hoc* statements in this litigation that the 1968 zoning ordinance was enacted invalidly, plaintiffs had been on clear notice that mobile homes were prohibited within the sewered area of the Town of Epping. Further, at least as early as July 1, 1971, plaintiffs were on clear notice that only those habitable dwellings which were located within 200 feet of a "way" could be connected to the municipal sewer system.

Furthermore, plaintiffs cannot seriously argue that, in any event, they had a "natural" or "vested" right to establish and develop their mobile home park, wherever they elected within the Town of Epping. The courts of this state have upheld the constitutionality of zoning ordinances and land use policies which regulate the number and location of mobile homes as a legitimate regulation "where governed by standards relating to the advancement of health, safety and general welfare." *Greenland v. Hussey,* 110 N.H. 269, 266 A.2d 122 (1970); *New Boston v. Coombs,* 111 N.H. 359, 361, 284 A.2d 920 (1971); *Londonderry v. Faucher,* 112 N.H. 454, 299 A.2d 581 (1972); *Riverview Park, Inc. v. Hinsdale,* 113 N.H. 693, 696, 313 A.2d 733 (1973). These decisions recognize the reasonableness of such regulation in light of the need to preserve the quality of life and to protect citizens from the burden of shouldering excessive and disproportionate tax burdens for the purpose of maintaining public facilities to accommodate the needs

of a population which, in the main, is transient. *See Riverview Park,* 113 N.H. at 696, 313 A.2d 733. The Supreme Court recognizes the pursuance of such goals to be a valid exercise of the authority to act in promotion of the "general welfare." The Court has liberally defined the term "general welfare", as follows:

> The values [general welfare] represent are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled.

*Berman v. Parker,* 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). *See Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), wherein the Supreme Court upheld a zoning law that defined the term "family" so as to exclude the plaintiffs, a group of six, unrelated college students.

### C. *Equal Protection of the Law*

The thrust of plaintiffs' equal protection argument is two-fold. First, plaintiffs assert that other developers and/or property owners, similarly situated, have been allowed to connect to the Town's sewer system, even though their properties are located outside of the 200-feet access area. Plaintiffs offer as examples of such discriminatory conduct on the part of the defendants, the following specific charges:

(1) Defendant Chamberlain promoted sewer and water service to the Industrial Zone, which is located beyond the 200-feet access area.

(2) Defendant Chamberlain spoke in favor of expanding the Epping town sewer system to accommodate the needs of the Emissaries of the Divine Light.

(3) Defendant Chamberlain ignored the 200-feet access rule and allowed the Watergate Apartments, located across

---

11. *See* Response of Defendant Town of Epping, Attachment D (Docket No. 336).

12. Plaintiffs belatedly attempted to raise the matter of the alleged technical defects in the

adoption of the zoning ordinance by way of a motion for new trial to present this "newly-discovered" evidence. The motion was denied by the State Supreme Court.

from plaintiffs' mobile home park, to connect to the sewer system.

■ The accuracy of plaintiffs' assertion that the owners of the Watergate Apartments and the Emissaries of the Divine Light are "similarly situated" to these plaintiffs, as regards the intended use of their respective properties is seriously questioned, in light of the overriding land use policy which regulated the location and number of mobile homes in the Town of Epping. Furthermore, the appearance of favoritism necessarily arises where an ordinance confers a benefit on one and denies it to another, such as ostensibly occurred here. However, this is a necessary product of legislation which attempts to accommodate competing interests and, in no event, does it raise the inference of a violation of equal protection. So long as such action derives from ordinances which are reasonably related to legitimate state goals, such as the protection of the general welfare, the conduct cannot be assailed on federal constitutional grounds. *See Rogin v. Bensalem Township,* 616 F.2d 680, 687 (3d Cir. 1980).

■ Even if the actions of the Town officials in granting these connections to the sewer system did not comply in every minute detail with the Town's regulations (and this is not at issue here), that fact alone, would not amount to a constitutional claim based on denial of equal protection. *See Snowden v. Hughes,* 321 U.S. at 8, 64 S.Ct. at 401; *Birnbaum v. Trussell,* 371 F.2d 672 (2d Cir. 1966). Moreover, any substantive or procedural irregularity in the granting of such permits could have been raised in an administrative forum or in the state courts. However plaintiffs, as was the case with respect to most of the challenges raised here, chose not to avail themselves of these state remedies.

■ In summary, the only reality existent here is that these plaintiffs are asserting a state-created right, if indeed, any right at all. The allegations of federal constitutional violations are wholly frivolous and invoked for the mere purpose of attempting to maintain this action in a federal forum. Plaintiffs raise no substantial federal claim which could serve as the basis of federal jurisdiction.[13] *See Bell v. Hood,* 327 U.S. 678, 682–84, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946).

The Court is constrained to emphasize that the holding within should not be interpreted to mean that federal jurisdiction can never be properly invoked with respect to local zoning ordinances and policies. A cause of action under the Civil Rights Act or the Fourteenth Amendment can be brought in a federal forum to remedy violations of federal constitutional rights. For instance, in *Kennedy Park Homes Ass'n v. City of Lackawanna,* 436 F.2d 108 (2d Cir. 1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971), the court determined that plaintiffs' constitutionally-protected right to be free from discrimination in the enjoyment of their property rights had been violated by the actions and policies of the city. The facts of that case reveal a long and notorious history of attempts to confine black residents in one ward of the city, which the Court of Appeals described as a ward having the highest rate of infant mortality and tuberculosis, and the oldest, most dilapidated dwelling houses in all the city. Finally, when plans had been made to construct low-income housing projects in another ward of the city, the city and its various zoning and planning boards and officials orchestrated a series of events to block those plans.

Another example of zoning disputes properly brought before a federal forum is the seminal case of *Village of Euclid v. Ambler*

---

**13.** Having determined that plaintiffs raise no substantial federal question, the Court need not address the novel issue of whether the definition of a "class" devised by plaintiffs may support an equal protection claim and, further, whether these plaintiffs have standing to assert the rights of such third persons.

In accordance with the holding within, the Section 1981 claim is dismissed and the request for relief, pursuant to 28 U.S.C. §§ 2201 and 2202 is denied. Further, the various state and common law claims raised by plaintiffs must be dismissed for want of jurisdiction.

*Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). In that instance, Ambler Realty, the owner of unimproved land in the Village of Euclid, brought an action to enjoin prospectively the enforcement of a comprehensive zoning ordinance on the ground that the ordinance was in derogation of its Fourteenth Amendment rights; namely, the ordinance restricted and controlled the lawful uses of plaintiff's land amounting to a confiscation and denial of the value of plaintiff's land. The Supreme Court upheld the ordinance, determining the ordinance to be reasonably related to the goals of maintaining the public health, welfare and morals of the community.

That Supreme Court decision teaches and cautions that review of local zoning matters by the federal courts is narrowly restricted. Zoning ordinances and regulations will be set aside only if clearly unreasonable and arbitrary, bearing no substantial relation to the public health, safety, morals or general welfare. *Village of Euclid,* 272 U.S. at 395, 47 S.Ct. at 121. *See South Gwinnett Venture v. Pruitt,* 491 F.2d 5, 7 (5th Cir.), *cert. denied,* 419 U.S. 837, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974) ("[L]ocal zoning is a quasi-legislative function, not subject to federal judicial consideration in the absence of arbitrary action.").

Further, a state of facts, such as in the case of *Heritage Farms, Inc. v. Solebury Township,* 671 F.2d 743 (3d Cir. 1982), *cert. denied,* —— U.S. ——, 102 S.Ct. 2270, 73 L.Ed.2d 1285 (1982) may raise a substantial federal question susceptible of review in a federal forum. Moreover, under an appropriate factual setting, a developer of housing for minority groups may have standing to assert the rights of such third persons and to challenge discriminatory zoning ordinances. *Des Vergnes v. Seekonk Water District,* 601 F.2d 9 (1st Cir. 1979).

This Court recognizes the long-standing public concern of the citizens of the State of New Hampshire in providing housing for persons of low and moderate income—by and large, the young and the old. *See* discussion in *Steel Hill Development, Inc. v. Town of Sanbornton,* 338 F.Supp. 301 (D.N.H.1971), *aff'd,* 469 F.2d 956 (1st Cir. 1972) and *Steel Hill Development, Inc. v. Town of Sanbornton,* 392 F.Supp. 1134 (D.N.H.1974), wherein the First Circuit Court of Appeals upheld a minimum lot size zoning ordinance, the constitutionality of which had been challenged by an owner of property desiring to develop mobile home condominiums to meet the needs of young and old residents. At the same time, however, prudential considerations caution that, no matter how significant the underlying public concern, it cannot be countenanced that a federal court gratuitously assume the role of a benefic adjudicator of the ultimate public good on behalf of local townspeople and communities. Only by safeguarding the scope of the lawfully-vested jurisdiction of the federal courts can the important goals of comity and federalism be preserved and furthered.

*Allegations Against Individual Defendants*

Plaintiffs have attempted to paint a mosaic of arbitrary actions on the part of various of the defendants in relation to the application of rules and regulations of the Town, in order to bolster their claim of federal constitutional violations.[14]

Several points should be noted. First, the basis for plaintiffs' challenge to the various regulations and to the conduct of the individual defendants is the alleged invalidity of the 1968 zoning ordinance. Enough has been said about that contention. Second, plaintiffs sought no relief from these alleged arbitrary requirements, by way of administrative or court review. Moreover, plaintiffs do not complain that no avenues of redress were available to them under the statutory scheme, or, alternatively, that the avenues which were available to them were inadequate.

---

**14.** For example, plaintiffs refer to the refusal of the Sewer and Water Commission, in September, 1976, to grant them a sewer connection permit for their apartment complex until plaintiffs first obtained a land use permit from the Epping Planning Board. Additionally, plaintiffs complain of the requirement imposed on them that they obtain an affirmative town vote as a condition to being granted a sewer connection permit for their mobile home park.

The Supreme Court has set the parameters of permissible involvement of federal courts in state and local administrative decisions and actions; namely, the task of a federal court is not to adjudicate or serve as an oversight body in judgment of the wisdom or correctness of administrative decisions, but only to determine whether the state provides an adequate avenue for review of such decisions. *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Not surprisingly, these plaintiffs are of the opinion that it is a violation of their constitutional rights to require them to seek review of administrative decisions before a court of law or administrative body.

■ For purposes of determining whether a federal question has been raised, the Court must not be distracted by picayune charges that local officials misinterpreted and/or misapplied their rules and regulations, or merely gave an applicant the proverbial "runaround." The *sine qua non* for the triggering of due process safeguards is, as addressed hereinabove, a protectible property or liberty interest, equating to a fundamental interest or an interest that has its genesis in state law. *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Procedural due process does not guarantee against the imposition of mere inconveniences, hardships or encumbrances on persons who must deal with the federal, state or local governments, nor does it serve as assurance that officials and functionaries can never err in performance of their responsibilities.

■ The repeated allegations of malice and purposefulness on the part of these defendants are simply that, and no more. Clearly, they add nothing to the substantive and operative facts which the Court has addressed in its discussion of the question of federal jurisdiction. In the words of the Supreme Court:

> Insubstantial lawsuits can be quickly terminated by federal courts alert to the possibilities of artful pleading. Unless the complaint states a compensable claim for relief . . ., it shall not survive a mo-

tion to dismiss. Moreover, the Court recognized in *Scheuer* that damage suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment. . . . In responding to such a motion, plaintiffs may not play dog in the manger and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits.

*Butz v. Economou,* 438 U.S. 478, 507–508, 98 S.Ct. 2894 (1978). *See Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1981).

The First Circuit Court of Appeals has demonstrated a keen sensitivity to the proper role to be assumed by the federal courts where allegations, such as here asserted, are raised in a civil rights action. The guiding principle is basic and simple—

> [Planning decisions and disputes] which take place within the framework of an admittedly valid state subdivision scheme is a matter primarily of concern to the state and does not implicate the constitution . . . even were planning officials to clearly violate, much less "distort" the state scheme under which they operate.

*Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 833 (1st Cir. 1982).

■ In summary, drawing every possible inference favorable to these plaintiffs, the subject allegations prove nothing more than that the individual town officials erred in performance of their discretionary duties. The First Circuit has expressly rejected the proposition that legal or procedural error of a local planning or zoning board constitutes a taking of property without due process of law.

A few general observations are necessary in light of the very broad and numerous charges levelled against the defendants. No matter how vociferous the rhetoric of the defendants had been at town assemblages, or elsewhere, in opposition to plaintiffs, either personally or to their proposed mobile home park or apartment complex, these defendants, no less than plaintiffs,

were free to exercise their First Amendment rights with impunity. As citizens of the Town of Epping, they had a personal stake and interest in matters affecting the Town, notably land use planning—private interests which were not extinguished upon assuming official positions in government.

 Assuming the best state of affairs as regards plaintiffs' claims, namely, that the defendants schemed to taint the image of plaintiff Wilfred Cloutier—essentially an anti-zoning, pro-mobile home park image, that set of facts would establish a conspiracy against one, not a civil rights conspiracy. *Oaks v. City of Fairhope,* 515 F.Supp. 1004, 1046 (S.D.Ala.1981).

 Furthermore, it is axiomatic that activities of legislators, state and local, in the performance of official duties may not be sanctioned under the Civil Rights Act. *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, Inc.,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979); *Hernandez v. City of Lafayette,* 643 F.2d 1188 (5th Cir. 1981), *Bruce v. Riddle,* 631 F.2d 272 (4th Cir. 1980). As a consequence, the conduct of various of these defendants in proposing an ordinance (which ultimately was defeated), setting percentage limitations on the number of mobile homes which could be located in the Town of Epping is absolutely immune. The immunity extends as well to the zoning changes proposed by certain of the defendants at the 1977 and 1978 town meetings and to the proposal to rezone plaintiffs' mobile home park site.

Plaintiffs also impute an evil motive to defendants by reason of the moratorium on sewer and water connections imposed by the Sewer and Water Commission shortly after plaintiffs had obtained their state sewer discharge permit. As with their other allegations, plaintiffs did not test the validity of the moratorium in court or by administrative review. It is beyond challenge that the police power of a state is an indispensable prerogative of sovereignty and establishes in elected officials broad authority to promote the general welfare,

health and safety of the public, including the imposition of such a moratorium. *Smoke Rise, Inc. v. Washington Suburban Sanitary Commission,* 400 F.Supp. 1369 (D.Md.1975).

 Finally, plaintiffs allege an unconstitutional taking and excessive taxation in violation of the Fourteenth Amendment. The Town has instituted an eminent domain proceeding in the state court; consequently, this claim is not properly before the Court. As to the alleged excessive taxation of plaintiffs' property, the Supreme Court has held that Section 1983 is not a vehicle for redress of such claims. *Fair Assessment in Real Estate Ass'n v. McNary,* 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981).

In accordance with the aforegoing ruling that the allegations of the amended complaint herein raise no substantial federal question over which this Court may assume jurisdiction, the instant action shall be dismissed with prejudice. A separate order will be entered effectuating this ruling.